**NOT FOR PUBLICATION**                                      **CLOSED**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                        )
TRANSMODAL CORP.,                       )        Hon. Faith S. Hochberg
                                        )
                    Plaintiff,          )        Civil Case No. 09-3057 (FSH)
          v.                            )
                                        )        **OPINION &**
                                        )        **FINAL JUDGMENT**
EMH ASSOCIATES, INC., *et al*.,         )
                                        )        Date: January 14, 2011
                    Defendants          )
_____ )

**HOCHBERG, District Judge:**

**OPINION**

**I.      Introduction**

        This case arises out of a dispute over the amounts due under a contract to ship

goods into the United States from overseas.  A bench trial was held before the undersigned on

October 12, 2010.  Testimony was heard from three witnesses: Mr. Max Kantzer (of

Transmodal); Mr. Anthony Ambrosio (of Transmodal); and Mr. Eli Hazan (of EMH).  The Court

has considered the parties' stipulations of fact, the evidence adduced at trial, and the legal

arguments submitted by the parties.  The case is now ripe for final judgment on the merits.

**II.     Background**

        **A.      The Parties**

        EMH Associates, Inc. ("EMH") is a corporation organized under the laws of New

York.  Its principal place of business is located at 526 Seventh Avenue, New York, New York.

EMH is a manufacturer/importer of finished ladies' garments, for sale to retail stores throughout

the country.  Mr. Eli Hazan is the President and sole shareholder of EMH. (Stip. 1.)

Transmodal Corp. ("Transmodal") is a Massachusetts corporation with its principal place of business in Ramsey, New Jersey.  Transmodal is a freight forwarder and customs broker.  It arranges for the transportation and customs clearance of cargoes entering the United States by ocean-going vessels and airplanes, as well as for transportation within the United States to customers of Transmodal's clients.  (Stip. 5.)  It does not own its own ships or airplanes.  (Tr. 6:5.)

### B.    The Contract

Transmodal's Vice President for Sales and Marketing, Mr. Anthony Ambrosio originally contacted EMH in late 2008 or January 2009 to offer Transmodal's services as a freight forwarder.  (Stip. 6.)  The parties agreed to do business together, and EMH commenced using Transmodal for its shipping needs in or around January 2009.  (Stip. 9.)

On or about January 5, 2009 Eli Hazan, on behalf of EMH, executed a document entitled "Credit Application and Agreement", between EMH and firms identified as Freight Savers Shipping Co., Ltd. and Transmodal Associates, Inc.  The document was admitted as Exhibit P-1.  It is an application by EMH to obtain credit from Transmodal.  Exhibit P-1 makes no reference to any credit limit.  In the section titled "TERMS AND CONDITIONS," it states that invoices are payable 10 days from the date of the invoice ("Net 10").  Notwithstanding the provision in the writing, the parties agree that invoices were payable within 15 days ("Net 15").  Exhibit P-1 does not purport to incorporate by reference any extraneous documents or terms in the agreement.

Exhibit P-1 is a credit application only.  It does not include any provision

2

establishing the rates charged by Transmodal to ship merchandise.  Neither party introduced any

evidence regarding their agreement as to such rates.

### C.      The Revised Contract

EMH anticipated a large increase in its shipping volume in Spring 2009.  It had

orders for delivery of approximately 250,000 to 300,000 garments from Bangladesh, to be

imported into the United States over an 8 to 12-week period starting in April 2009.  Mr. Hazan

informed Mr. Ambrosio at the end of February 2009 about the expected increase in shipping

volume and asked whether Transmodal would be able to accommodate the increased volume.

Mr. Ambrosio replied that he could accommodate it and wanted all of EMH's shipping business.

(Tr. 47:23-48:8, 126:7-19.)  The parties stipulate that, by e-mails of January 30, 2009, April 22,

2009, May 2009 and June 12, 2009, Transmodal was soliciting to obtain all of EMH's shipping

needs.  (Stip. 26.)  Mr. Max Kantzer, the President of Transmodal, was also aware in March or

April 2009 that EMH's business was going to increase significantly, with hundreds of thousands

of garments to be shipped; the shipping charges would be in the hundreds of thousands of

dollars. (Tr. 48:8.)

EMH required additional credit terms in April 2009 due to the anticipated increase

in the volume of its shipments. (Tr. 18:25-19:3.)  The credit period was extended from Net 15 to

Net 30.  That means that invoices would be due and payable within 30 days.  On or about April

14, 2009, Mr. Hazan on behalf of EMH executed a new credit application (Exhibit P-4).  On the

line entitled "Credit Amount Requested" is written "$30,000."  On the line "Credit Terms

Requested" is written "Net 30."

On the second page of Exhibit P-4 is a section entitled **CREDIT**

**APPLICATION SUPPLEMENTAL TERMS AND CONDITIONS** which is followed by

three numbered paragraphs.  The second of those numbered paragraphs reads,

> ***Incorporation by Reference***.   The Customer(s) executing this Credit
> Application hereby agree(s) that payment for all services is subject to the
> terms and conditions noted on the preceding pages, that are incorporated
> herein by reference, including but not limited to Company's most recently
> updated General Terms and Conditions ("General Terms") located on
> Company's website at www.transmodal.net/generalterms.net, the terms of
> which are incorporated herein by reference.

Mr. Hazan testified that he was not provided with a copy of the General Terms and Conditions

document and was unaware of its contents.  (Tr. 125:13-21.)  Mr. Kantzer testified that the first

time he spoke to anyone at EMH about the Terms and Conditions document was in June 2009.

(Tr. 44:19-23.)

### D.    The Credit Limit and Transmodal's Remedies

The General Terms and Conditions document, which was drafted by Transmodal,

was introduced as Exhibit P-3.  Section 6(d)(i) of Exhibit P-3 purports to grant Transmodal the

right to demand payment in full of the *entire* outstanding balance within 48 hours if the customer

exceeds its credit limit (here, $30,000) as a precondition for the release of any shipment or

customer property in Transmodal's custody or control.  Contrarily, Section 8(c) purports to

require the customer to pay the amount *exceeding* the credit limit within 48 hours if the

customer's balance exceeds that amount, plus an overdraft fee.  Exhibit P-3 does not have a

signature block or any other indication on its face that EMH agreed to be bound by it.  The only

date on the document is October 10, 2010, two days before trial.  (Tr. 42:18-43:19.)  While Mr.

Kantzer of Transmodal testified that the document is unchanged since the date of the credit

application, except for the reference to the website, no one drew EMH's attention to the

(internally conflicting) terms within Exhibit P-3.

Transmodal placed into evidence as Exhibit P-7 its Statement of EMH's account dated May 28, 2009, summarizing and listing its open invoices and showing an open balance due from EMH in the amount of $237,982.00. This document was drafted by Transmodal and states, "**INVOICES ARE DUE & PAYABLE WITHIN 30 DAYS**." Every invoice dated after April 23, 2009 on Exhibit P-7 lists the due date as being 30 days after the date of the invoice, even though the amount outstanding is greater than the purported $30,000 credit limit.[1] That is inconsistent with Transmodal's General Terms and Conditions (Exhibit P-3). Although Exhibit P-7 refers to a "credit limit" of $30,000, it does not indicate that any sums owed in excess of $30,000 are payable immediately or within 48 hours of the date of such invoices; indeed it says that they are payable within 30 days of such invoice, with the corresponding due date for each invoice expressly stated on Exhibit P-7 itself.

Mr. Kantzer testified that EMH was subject to a credit limit of $15,000, which was increased to $30,000 in April 2009, but Transmodal routinely sought and accepted orders to place shipments for EMH that caused EMH's balance to exceed those amounts. As early as February 4, 2009 EMH's statement of account reflects a debt of $41,614.00 (Exhibit D-13). Similarly, the statement of March 24, 2009 reflects a debt of $37,740.31 (Exhibit D-14). The statement dated April 30, 2009 shows a total due of $49,365.75 (Exhibit D-15), the May 5, 2009 statement shows a total due of $103,244.44 (Exhibit D-16), and the May 8, 2009 Statement shows a total due of $117,477.68 (Exhibit D-17) (Stip. 28).

---

[1] Although the invoices themselves are not in evidence, the parties stipulate that each invoice contained a due date and that the due dates were Net 30 – *i.e.*, 30 days after the date of the invoice. (Stip. 17.)

5

EMH anticipated a large increase in business in Spring 2009, and Transmodal eagerly sought that increased business[2] without ever stating to EMH that acceptance of these larger shipments would alter their previous contract and course of business by making hundreds of thousands of dollars payable within 48 hours, as soon as the credit exceeded $30,000. Such a profound change in business practice required a meeting of the minds far clearer than the internally inconsistent language on Transmodal's website. The Court credits Mr. Hazan's testimony that there was no such meeting of the minds. (Tr. 126:16-18.)

### E.    Transmodal Freezes EMH's Account and Demands Payment

On May 28, 2009, Transmodal suddenly demanded that EMH pay $207,000 and refused to release one of EMH's shipments to EMH's customer without the balance being paid. (Stip. 15.) Mr. Kantzer testified that around that time he investigated whether EMH had any shipments in the pipeline with Transmodal and was alarmed to discover that there was only one such shipment (the one that was seized). A second shipment had been booked but was later canceled by EMH. (Tr. 33:20-34:8.) Mr. Kantzer further testified that Mr. Hazan asked that the shipment be released so EMH could pay Transmodal, but Mr. Kantzer refused on the grounds that Transmodal would have no other collateral in its control. (Tr. 33:7-14.) On May 29, 2009, EMH paid $25,099.96 to Transmodal in an effort to get the shipment released for sale by EMH to its customer, Vanity Fair Outlets, Inc. The goods were ladies' fashions, to be sold at retail in that season by Vanity Fair. Despite the $25,099.96 payment, Transmodal refused to release the

---

[2]    Mr. Hazan told Mr. Ambrosio that he could spread his business around several freight forwarders if Transmodal could not handle the volume, and Mr. Ambrosio replied that he wanted all of EMH's business. (Tr. 126:11-16.)

container load to EMH and seized its contents.  Despite this Court's order of July 24, 2009,[3] the goods were sold at salvage for a small fraction of their value.  EMH therefore was unable to perform its contract of sale with Vanity Fair.

According to Exhibit P-7, on May 28, 2009 only the sum of $4,053.58 was listed as past due.  In fact, by virtue of the payment of $25,099.96 on May 29, 2009, no additional monies were due to Transmodal, according to Exhibit P-7, until June 9, 2009.  Transmodal did not contend at trial that it froze EMH's account for past due invoices; it argued only that EMH was in violation of its $30,000 credit limit. (Tr. 95:10-11, 107:18.)

### F.    Damages

Transmodal did not adduce at trial any actual unpaid invoices as evidence of the amount owed by EMH.  Transmodal also did not adduce its records of the costs it incurred and paid in shipping EMH's merchandise.  Counsel for Transmodal expressly disclaimed any claim to "reliance-type" damages.  (Tr. 274:14-15.)  Instead, Transmodal chose to rely exclusively on Exhibit P-7 as evidence of this amount.

However, Exhibit P-7 is not an accurate statement of account.  Transmodal admitted at trial that Exhibit P-7 lists among the due and payable charges certain duty charges that were to be paid to U.S. Customs but were not, in fact, paid by Transmodal to U.S. Customs.

---

[3]    The Court ordered on July 24, 2009 that the merchandise could be sold by Transmodal so long as the sale price was not less than $75,000, with the proceeds deposited with the Court.  The $75,000 figure was based on testimony from Mr. Ambrosio, a Transmodal executive, that the value of the seized goods was $93,000.  Transmodal was ordered to obtain the consent of EMH or the Court if it intended to sell the merchandise for less than $75,000. Transmodal waited a year and then sold the merchandise in July or August 2010 for a mere $4500 without the consent of EMH or the Court, in violation of the Court's Order.  The proceeds were not deposited with the Court.

The sum sought in Exhibit P-7 is therefore inflated by the amount that Transmodal billed to EMH but did not actually pay to U.S. Customs: $10,000.  (Tr. 58:21-23; 89:5-9.)  Exhibit P-7 also does not account for payments made by EMH to Transmodal after May 28, 2009, specifically the $25,099.96 paid by EMH on May 29, 2009 (50:5-9), or the $4,500 (or potentially more)[4] received by Transmodal in July or August 2010 for selling the goods it seized from EMH. (Tr. 27:21.)  Finally, Mr. Hazan disputed many of the charges and surcharges invoiced to him (Tr. 184:18-21); the actual charges supporting these claimed amounts due were ordered to be produced in discovery but were never produced by Transmodal in discovery but were never produced.[5]

### G.   Counterclaim

EMH adduced evidence relating to its damages from Transmodal's seizure of its merchandise.  The merchandise was to be delivered to EMH's customer, Vanity Fair Outlets, Inc.

------------------------------------------------------------

[4]     Mr. Kantzer testified that the sale price was $4500.  However, Transmodal refused to produce its records from that sale as well.  It did not do so.

[5]     Transmodal purportedly chose to withhold the records because they were "too burdensome" to produce. (Tr. 63:13-19.)  That explanation was not credible for several reasons. First, Exhibit P-7, which lists Transmodal's invoices to EMH, has a total of 39 entries, some of which were satisfied by the $25,099.96 payment.  Others represented customs duties never paid by Transmodal.  It is unlikely that the number of invoices from Transmodal's vendors were great in number.  Second, they are records that Transmodal would have kept in the ordinary course of business.  Third, whether or not plaintiff intended to seek "reliance-type" damages, the documents requested by EMH are relevant to this case under the meaning of Rule 26(b)(1); they should have been produced.

Because Transmodal withheld these documents, the Court has concerns that the disputed fees on the invoices for such fees as "fuel" and "security" surcharges might not have been fully legitimate. The Court may – and does – draw an adverse inference from Transmodal's refusal to produce these documents, which are peculiarly within its control.  *See United States v. Molina-Guevara*, 96 F.3d 698, 703 n.1 (3d Cir. 1996).

EMH paid $21,048.40 to the factory (Vitesse) for the manufacture of this merchandise, and the sales price of the goods to be delivered to Vanity Fair was $38,930.40.  (Tr. 153:8-11, 155:23; Exhibit D-50 at 1020.)  The amount that it cost for Transmodal to transport the seized shipment was not proven by a preponderance of the evidence because the individual invoices were not offered into evidence.

III.    **Discussion**

    A.    **Choice of Law**

Jurisdiction in this case is based on diversity of citizenship.  The first issue before the Court is therefore what state's law to apply.  Neither party argues that the choice of law is material to deciding the breach of contract claims before the Court.  EMH asserts that there is no material difference between the law of New York and New Jersey.  Transmodal agrees that New York law is materially the same as New Jersey law.  It also notes that the General Terms and Conditions document provides that New Jersey law applies and cites New Jersey case law in its brief.  This Court finds that the parties have consented to the application of New Jersey law.  *See Datasphere, Inc. v. Computer Horizons Corp.*, 05-2717(SRC), 2009 WL 2132431, at *6 (D.N.J. July 13, 2009).  The Court must apply New Jersey law as announced by the New Jersey Supreme Court.  *See Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 253 (3d Cir. 2010).  The Court must also consider the reasoned decisions of the state's intermediate appellate courts as indicia of the law of the New Jersey and may not disregard those decisions unless it is persuaded that the New Jersey Supreme Court would decide otherwise.  *See id.* at 254.

    A.    **Breach of Contract**

The lone count remaining in this case is Count II: Book Account – Breach of

9

Contract.[6]  To establish a breach of contract claim under New Jersey law, a plaintiff must prove

by preponderance of the evidence (1) the existence of a valid contract, (2) breach of the contract

by the defendant, and (3) damages.  *See Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct.

App. Div. 2007).

> ### 1.   The Contract

The parties do not dispute that they had a basic contract to ship goods.  The Court

must ascertain the terms of that contract, which are disputed.  "The polestar of construction of a

contract is to discover the intention of the parties. ... Any number of interpretative devices have

been used to discover the parties' intent.  These include consideration of the particular

contractual provision, an overview of all the terms, the circumstances leading up to the formation

of the contract, custom, usage, and the interpretation placed on the disputed provision by the

parties' conduct."  *Kearny PBA Local No. 21 v. Town of Kearny*, 405 A.2d 393, 400 (N.J. 1979).

Three writings purporting to reflect the terms of the parties' agreement as of the

date of breach are in evidence: Exhibits P-3, P-4, and P-7.  Exhibit P-4 (the April 2009 credit

application) is signed by Mr. Hazan and purports to incorporate by reference a General Terms

and Conditions document.  Mr. Kantzer testified that Exhibit P-3 (the General Terms and

---

[6]      "A book account is based on transactions creating a debtor and creditor relation,
evidenced by entries made and kept in a 'book' regularly kept and used for that purpose."  52
N.J. Prac., *Elements of Action* § 4:1 (2010-11 ed.).  The parties have not cited any authority that
the elements of a book account case are different from an ordinary breach of contract case in
New Jersey, except that the amount owed in a book account case may be proved in New Jersey
state courts by the books of account pursuant to New Jersey Rule of Evidence 803(c)(6).  *See
Honeywell Int'l, Inc. v. O.A. Peterson Const. Co.*,  2008 WL 2340278, at *5 (N.J. Super. Ct.
App. Div. June 10, 2008).  The New Jersey rule is similar to Federal Rule of Evidence 803(6),
which is applicable in this Court.  Transmodal's statement of EMH's account (Exhibit P-7) was
admitted under this Rule.

Conditions document) is the same document that Exhibit P-4 purports to incorporate by reference. This testimony is not corroborated by the document itself, which is unsigned and undated except for the date October 10, 2010, which is presumably when the document was printed out for the purposes of the trial. Mr. Hazan denied that he had ever seen the document before, and Transmodal did not impeach this testimony. Exhibit P-7 is Transmodal's statement of EMH's account, which lists the dates when payments were due.

The writings are entirely contradictory regarding when balances are due. According to Exhibit P-3, once the credit balance exceeds $30,000, either the entire balance or the balance above the credit limit is due and payable within 48 hours. This is a substantial difference, and both of those purported "due dates" are contradicted by Exhibit P-7, which explicitly shows the balance of each individual invoice becoming due on a rolling basis, thirty days after it issued. "Where an ambiguity appears in a written agreement, the writing is to be strictly construed against the draftsman." *In re Miller's Estate*, 447 A.2d 549, 555 (N.J. 1982). In this case, the draftsman is Transmodal.

Messrs. Ambrosio and Kantzer knew that EMH anticipated a large increase in merchandise to be shipped in Spring 2009. Mr. Hazan testified that Mr. Ambrosio told him on several occasions that Transmodal wanted to obtain all of EMH's shipping business, which would be substantially in excess of $30,000. Mr. Hazan's testimony is consistent with the course of the parties' dealings: Transmodal routinely accepted orders from EMH in excess of the purported credit limit.

Transmodal failed to prove by preponderance of the evidence the existence of a contract whereby EMH's charges up to $30,000 would be payable within 30 days but any amount

in excess of the $30,000 (or the entire amount) would be payable within 48 hours.  Such an arrangement was neither established by testimony nor reflected in the parties' dealings, and it was contradicted by Transmodal's own statement of account, Exhibit P-7.  Instead, the Court concludes that invoices were due and payable within 30 days, regardless of the amount.  To the extent a "credit limit" was applicable to EMH's account, Transmodal waived it when it sought and accepted orders in excess of the credit limit.  Transmodal's solicitation and acceptance of such orders did not give it the contractual right to accelerate EMH's debt without clearly providing notice of those terms.  Exhibits P-3, P-4, and P-7 each evince different payment "due dates," and Transmodal adduced no testimony that it orally gave notice in advance of soliciting and accepting large shipments that its "Net 30" terms would be altered thereby.  The clearest document of the three contradictory documents provides "Net 30" terms regardless of the dollar amount: that establishes the contract.

> 2.   Breach

Transmodal next must prove by a preponderance that EMH was in breach because its account balance exceeded $30,000.  It does not contend that EMH was in breach for being past due.  (Tr. 234:3-11.)  Since Transmodal failed to prove that the parties agreed that it could seize EMH's merchandise as soon as the balance exceeded $30,000, Transmodal has not proven breach by EMH.

Rather, Transmodal breached the parties' agreement on May 28, 2009 by seizing the shipment.  However, its breach extends only to the shipment that was improperly seized; there is no dispute that Transmodal released the remaining shipments to EMH and/or its customers in accordance with the contract.  Accordingly, EMH is in breach with respect to those

shipments for any failure to pay the undisputed amounts of the shipping charges.  The disputed amounts have not been proven by Transmodal due to its failure to adduce the individual invoices and because it relied upon a flawed and unreliable summary, Exhibit P-7.

      3.    <u>Damages</u>

The New Jersey Supreme Court has explained that "[j]udicial remedies upon breach of contract fall into three general categories: restitution, compensatory damages and performance." *Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C.*, 921 A.2d 1100, 1107 (N.J. 2007) (quoting *Donovan v. Bachstadt*, 453 A.2d 160, 165 (N.J. 1982)). "Restitution returns the innocent party to the condition he or she occupied before the contract was executed.  Compensatory damages put the innocent party into the position he or she would have achieved had the contract been completed.  Performance makes the non-breaching party whole by requiring the breaching party to fulfill his or her obligation under the agreement." *Id.*

Transmodal expressly disclaimed restitution, or "reliance-type," damages at trial. (Tr. 274:14-15.)  Even if it had not, it failed to produce in discovery or adduce at trial its documents establishing the amounts it paid to the shippers to transport EMH's freight.[7]  If these documents were in evidence, Transmodal could have argued that it was entitled to at least the costs that it incurred shipping the merchandise.  Since they were not produced in discovery, Transmodal was barred by order of Magistrate Judge Shwartz from making such an argument.

Compensatory damages in this case would reflect the outstanding, agreed-upon

---

[7]    In the Final Pre-Trial Order, Magistrate Judge Shwartz ordered that Transmodal would not be permitted to testify about payments to its vendors unless the bills and proof of payment were produced by July 30, 2010.  At the final pre-trial conference on July 21, 2010, plaintiff's counsel represented that he would produce those documents.  He did not.

amounts due for Transmodal's services as a freight forwarder, including the expected profits, if Transmodal proved these amounts. Transmodal did not introduce into evidence the applicable cargo rates (*e.g.*, shipping costs per garment and other fees) or the total amount of cargo shipped, from which the Court might have calculated compensatory damages. Instead, Transmodal relies entirely on Exhibit P-7 (the statement of account) to prove the true amount owed. In a book account case, the amount owed for services rendered can be proved by a statement of account. *See Hackensack Hosp. v. Tiajoloff*, 204 A.2d 902, 903-04 (N.J. Super. Ct. App. Div. 1964). "However, when the reasonable value of those services is placed in issue, ... the books of account alone usually cannot supply that proof." *Id.* at 904. In *Hackensack Hospital*, for example, the Appellate Division vacated the trial court's judgment in favor of the plaintiff creditor in part because its book of account provided "no means of determining the value of the services." *Id.* This Court is unable to rely on the accuracy of Exhibit P-7 to establish Transmodal's compensatory damages for the shipments that were not seized.

In reading the Final Pretrial Order, there is no dispute in this case that *some* payment was due for the shipments that were delivered according to the contract. For all shipments except the last one that was seized, Transmodal performed. EMH was obligated to render payment of the price of shipping the goods, with the exception of the last shipment, because Transmodal seized it and did not perform under the contract. Although Mr. Hazan testified that disputes existed concerning the accuracy of certain invoices and the basis for certain surcharges, EMH only enumerated $70,349.29 in allegedly questionable fees and surcharges

14

among its contested facts in the Final Pretrial Order.[8]  In addition, the Court finds that because Transmodal did not perform on the last shipment, it is not entitled to $3,054 for shipping that last container.[9]

The Final Pretrial Order expressly states, "Proof shall be limited at trial to the matters set forth below.  Failure to set forth any matter shall be deemed a waiver thereof."  By limiting the challenged amounts in the invoices to $70,349.29, EMH has waived its argument that it is not liable for the amounts it did not contest.  *See Ultraflex Sys., Inc. v. Verseidag-Indutex GmbH*, No. 01-129(JLL), 2006 WL 1098181, at *4 (D.N.J. Mar. 30, 2006). Transmodal performed its contract by delivering the goods; it is entitled to compensatory damages from EMH in the amount of $124,978.75.[10]

4.     Counterclaim/Set-off

EMH has proven by a preponderance of the evidence that Transmodal's breach of contract, with respect to the seized shipment, damaged EMH in the amount of $38,930.40.  That amount is set off against Transmodal's compensatory damage award.

**IV.     Conclusion & Final Judgment**

---

[8]     Specifically, EMH disputed $11,354.90 in "inland freight" charges, $1,410 in "handling" charges, $36,938.51 in "fuel" surcharges, $6,029.92 in "security" surcharges, $2,698.12 in "storage" charges, and $11,917.84 in miscellaneous charges.  Transmodal refused to produce any documents to substantiate these charges.  The Court thus infers adversely to Transmodal that they were fictional, inflated, or otherwise cannot be substantiated.

[9]     We use the larger of the two possible charges for the seized shipment ($2,960 and $3,054), because Transmodal failed to prove which entry in Exhibit P-7 corresponded to it.  (Tr. 229:17-230:14.)  It was Transmodal's burden to prove the lesser sum, which it did not meet. Transmodal was uniquely in a position to adduce this proof.

[10]     Since EMH's obligation under the contract was exclusively to pay money, "performance" as a remedy for breach of contract is not applicable.

For the reasons set forth in this opinion, judgment is hereby entered in favor of plaintiff in the amount of $86,048.35.[11]


　　　　　　　　　　　　　　　　　 /s/  Faith S. Hochberg
　　　　　　　　　　　　　　　　　Hon. Faith S. Hochberg, U.S.D.J.

---

[11]　　　At the close of Transmodal's case, EMH moved for judgment as a matter of law. "Under Rule 50, a party may move 'for judgment as a matter of law ... at any time before the case is submitted to the jury,' and the court may enter judgment if it 'finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue....'" *Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 545-46 (3d Cir. 2010) (quoting Fed. R. Civ. P. 50(a)).  The motion is denied because, as set forth in this opinion, Transmodal has proven that it is entitled to judgment for the shipping charges that were not disputed in the Final Pretrial Order.